**In re John P. LANDI and Phyllis Landi, Debtors.**

**John P. Landi and Phyllis Landi, Plaintiffs,**

**v.**

**United States of America and State of New York, Defendants.**

**Bankruptcy No. 01–00526–9P7.**

**Adversary No. 01–62.**

United States Bankruptcy Court, M.D. Florida, Ft. Myers Division.

Sept. 24, 2002.

---

Ronald Stetler, Esquire, Naples, FL, for plaintiffs.

Phillip Doyle, Esquire, Washington, DC, for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

The matter under consideration, in this Chapter 7 case, is a suit filed by John P. and Phyllis Landi (Debtors) seeking a determination that certain tax liabilities of the Debtors are protected by the general bankruptcy discharge and are not within the exception set forth in 11 U.S.C. § 523(a)(1)(C). On February 5, 2001, the Debtors filed a two Count Complaint against the United States of America, Department of Treasury, Internal Revenue Service (Government) and the State of New York (New York).

In Count I of the Complaint, the Debtors seek to discharge income tax obligations owed to the Government for 1040 taxes for the following years: 1990, 1991, 1992, 1993, 1994, 1995, and 1996. In Count II of the Complaint, the Debtors seek to discharge income tax obligations owed to New York for the following years: 1989, 1990, 1991, 1992, 1993, 1994, and 1995.

Both the Government and New York filed their respective Answers. On July 2, 2001, a Stipulation was filed between the Debtors and New York. This Court on July 9, 2001, subsequently entered a Final Judgment in favor of the Debtors on Count II of the Complaint. The remaining count against the Government, Count I, proceeded to trial.

At the final evidentiary hearing, this Court considered the testimony of the witnesses and the Exhibits introduced into evidence, and based upon the same, makes these findings of facts and conclusions of law as follows:

It should be noted, at the outset, that the Government stipulated to the fact that the Debtors meet the criteria for dischargeability of the tax obligations for the tax years at issue, in that all taxes involved were due and owing for more than three years when the Debtors filed their Chapter 7 case. However, the Government contends that by virtue of Section 523(a)(1)(C) of the Code, the debts involved are non-dischargeable, and that the sole issue is the exception, specifically, whether the Debtors evaded payment of their taxes. Counsel for the Debtors orally objected to the "evasion of payment" assertion by the Government, arguing that said assertion is an affirmative defense that has to be specifically plead; however, this Court overruled the objection. Moreover, the Government conceded that the Debtors had paid the tax liability for the year 1992 in full. Be as it may, this Court shall make reference to the tax year 1992, as it is satisfied that the tax year is relevant to the Government's overall case.

### Background of the Debtors During the Relevant Years

The Debtor, John P. Landi, is a vascular surgeon since 1980. When he completed his fellowship following medical school in 1980, Dr. Landi opened his office in New York, which he operated until 1996 when he relocated to Naples, Florida. Dr. Landi has operated his medical practice through a professional corporation, John P. Landi, M.D., P.C. (the P.C.). Originally, the P.C. was named John P. Landi, P.C.; however, there was a name change sometime thereafter to John P. Landi, M.D., P.C.

Mrs. Landi has served as the office manager for Dr. Landi's practice since its in-

ception. Dr. Landi testified that this arrangement was a "team approach," with Mrs. Landi handling the financial end of Dr. Landi's practice, while he performed his surgeries. Although Dr. Landi signed all of the P.C.'s tax returns, Mrs. Landi met with the accountants and gathered the relevant information for the filing of the tax returns. Until 1990, Mrs. Landi initially received compensation by way of a salary from the P.C., however, since 1990, she has not and does not at present receive any "income" from the P.C., although she works there five days a week.

The record also reflects that Mrs. Landi was the owner of their first home, located at 44 West Patent Road, Bedford Hills, New York. This home was originally purchased in 1980 for $450,000. The Debtors spent approximately $1,000,000 in improving this property. In 1989, the Debtors sold their residence in Bedford Hills and purchased the 58–acre hilltop site overlooking a reservoir on Titicus Road. The Debtors netted over $1,500,000 from the sale of their Bedford Hills home. (Db.'s Exh. 18).

At the time of the purchase of the Titicus Road property, it was still unimproved. The Debtors hired an architect to draft their "dream home," and Mrs. Landi acted as general contractor for the construction of their home. During the construction of their dream home, the Debtors purchased and stayed at the Fox Den Lane home. The Debtors borrowed in excess of $2,600,000 for the purchase of the land and construction of the Titicus Road dream home. Mrs. Landi testified that as completed, the home was approximately 10,000 square feet, has six bedrooms, 10 bathrooms, and a basement of 6,000 square feet

on its own, with a fully equipped exercise room and jacuzzi. It is without dispute that they signed a financial statement on August 15, 1989, showing that the medical practice was worth $1,000,000; that the Debtors owned several automobiles; and that the Debtors had in excess of $250,000 worth of personal property. (Govt.'s Exh. 51, HVB134–135).

The record reflects that by the year 1990, Mrs. Landi was the owner of the following five pieces of real estate: (1) the building and property where the practice was housed, located at 2503 St. Raymends Avenue, New York City, New York; (2) 444A Heritage Hills, Somers, New York, where Dr. Landi's parents resided; (3) 441C Heritage Hills, Somers, New York, where Mrs. Landi's parents resided; (4) 218 Titicus Road, North Salem, New York, the "dream home" of the Debtors; and (5) Fox Den Lane, New Salem, New York. Mrs. Landi was the sole owner of all real properties as protection against possible medical malpractice judgments against her husband.

### Overview of Tax Years At Issue

As stated above, the tax year liabilities of the Debtors involve the tax years 1990 through 1996, excluding 1992, as it has subsequently been satisfied in full by the Debtors, although not when the tax became due for that tax year. This Court is satisfied that a review of all seven years is relevant to the dischargeability *vel non* of the total liability of the Debtors for unpaid taxes notwithstanding that the 1992 taxes were paid. A summary of the income earned by Dr. Landi, his subsequent tax liability, the Debtors' non-payment, and the Debtors' payment history is as follows.

| Year | Adjusted Gross Income [1] | Wages subject to withholding [2] | Non-Wage Income [3] | Income Tax [4] | Withholding credit [5] | Balance due [6] |
|---|---|---|---|---|---|---|
| 1990 | 579,495 | 450,934 | 51,462 | 107,916 84,174 [8] | 26,843 [7] 24,047 | 57,331 |
| 1991 | 756,173 | 376,380 | 251,564 | 110,289 | 25,307 25,202 [9] | 88,744 |
| 1992 | 613,205 | 285,337 | 327,119 | 137,287 | 52,660 | 87,420 |
| 1993 | 553,878 | 529,470 | 0 | 116,456 | 25,693 25,581 [10] | 94,446 |
| 1994 | 470,313 | 125,000 | 350,000 | 142,709 | 38,750 | 103,959 |
| 1995 | 379,926 | 22,230 | 365,000 | 113,635 | 3,000 | 116,657 |
| 1996 | 500,326 478,484 [11] | 0.00 | 488,919 | 182,695 | 3,230 | 157,944 |
| TOTAL [12] | 3,831,474 | 1,789,351 | 1,834,064 | 887,245 | 172,470 | 706,501 |

(Govt.'s Exhs. 1 and 9). In addition, each of the amounts are supported by the corresponding Form 1040 tax returns as filed by the Debtors. (Govt.'s Exhs. 2, 3, 4, 5, 6, 7, and 8).

With respect to the Debtors' income during the relevant years, as set forth in columns 1–3 of the chart, it is without dispute that the Debtors' adjusted gross income (AGI) for the seven-year period in question totaled $3,831,474. Of the AGI figure, $1,789,351 was from "wages subject to withholding," i.e., Dr. Landi's claimed income on his Form W–2 Wage and Tax Statement and $1,834,064 was from "non-wage income," either from his services at Mount Vernon hospital (MVH) or from the P.C. income not treated as wages, at least

1. This number coincides with line 31 of the Debtors' 1040 tax returns as filed.

2. This number coincides with line 7 of the Debtors' 1040 tax returns as filed (wages represented by a W–2 form).

3. This number coincides with line 22 (other income) or line 12 (business income) of the Debtors' 1040 tax returns as filed.

4. This number coincides with either line 54, 53, or 51 (total tax) depending upon the year of the Debtors' 1040 tax returns as filed.

5. This number coincides with either line 55 or 54 (fed. income tax withheld) depending upon the year of the Debtors' 1040 tax returns as filed, as opposed to line 60 or 62 (total payments applied) to the total tax owed.

6. This number coincides with either line 66, 64, 65, or 62 (amount you owe) depending upon the year of the Debtors' 1040 tax returns as filed.

7. This is the amount stated on line 54 of the Debtors' 1990 1040 tax return, although Govt.'s Exh. 1 indicated the higher amount.

8. This is the amount stated on line 62 of the Debtors' 1990 1040 tax return, which reflects the total amount of payments applied against the total tax due.

9. This amount is the amount stated on line 54 as opposed to line 60 of the Debtors' 1991 tax return.

10. This amount is the amount stated on line 54 as opposed to line 60 of the Debtors' 1993 tax return.

11. This amount is the amount stated on line 31 of the Debtors' 1996 tax return as opposed to the amount on the Govt.'s Exh. 1.

12. The total is based on the amounts stated in the tax returns and not necessarily as summarized by the Govt.'s Exh. 1.

not reported on his W–2. A further break down of the "non-wage income" reveals that in 1990, the MVH wages were $51,462; in 1991, MVH wages were $51,564 and P.C. wages were $200,000; in 1992 MVH wages were $51,564 and P.C. wages were $275,555; and in 1993 through 1996, the Debtors' non-wage income was reflected on line 12 (business income), as opposed to line 22 (other income) of their Form 1040. The Debtors' did not specify if the wages were from MVH or P.C. Be as it may, it is apparent that Dr. Landi's AGI was almost equally divided from his "wage income" and "non-wage income," initially the later, his non-wage income, comprising of most of his AGI for the years 1994 through 1996.

With respect to the Debtors' tax liability, as set forth in columns 3–6 of the chart, the total liability of the Debtors was $887,245, of which there was a "credit" for taxes withheld by the P.C. in the amount of $172,470, leaving a balance of $706,501 "not paid" by the Debtors. However, as more fully described below, the "credit" claimed is not supported by this record because no monies, or very little, were withheld and paid over to the Government.

The record confirms that the P.C. failed to pay its "withheld tax" due per Form 941 for the relevant time periods (1990 though 1996). The record reflects that for each quarter of each year that the net tax was due, the P.C. paid very little or nothing at all with its Form 941.

(1) year 1990, the P.C. net tax due $36,137.77, as opposed to the $1,846.31 paid;

(2) year 1991, P.C. net tax due $42,587.01, as opposed to the $560 paid;

(3) year 1992, P.C. net tax due $72,837.26, as opposed to zero paid;

(4) year 1993, P.C. net tax due $46,670.63, as opposed to $17,000 paid;

(5) year 1994, P.C. net tax due $69,590.10, as opposed to $4,591.85 paid;

(6) year 1995, P.C. net tax due $30,781.50, as opposed to zero paid; and

(7) year 1996, P.C. net tax due $8,769.56, as opposed to $5,509.45 paid.

(Govt.'s Exh. 17). The Government's Exhibit 17 is a chart that summarizes the numbers set forth in the "Certificate of Assessments, Payments, and other Specified Matters" of the P.C. for the tax years 1990 through 1996. (Govt.'s Exhs. 18, 19, 20, 21, 22, 23, and 24, which are the Certificates for each year at issue).

The summary of the income tax collections as of the date of the filing of the Petition was also admitted into evidence. (Govt.'s Exh. 25). This chart shows that the Government collected $12,775.41 from the Debtors by levy and $199,616.33 from the Debtors through voluntary payments. However, the chart also indicates that the total amount owed by the Debtors was $934,933.11, as of the Petition date. This amount is also confirmed by the Government's proof of claim, claim no. 9, filed on March 26, 2002, in the amount of $1,126,693.47, which includes penalties and interest.

| Year | Amounts Collected by Levy | Voluntary Amounts Paid | Tax and Interest Due as of the Petition Date |
|---|---|---|---|
| 1990 | 2,774.80 | 87,909.68 | 34,855.51 |
| 1991 | 10,000.61 | 11,231.84 | 143,959.84 |
| 1992 | 0 | 100,474.81 | 0 |
| 1993 | 0 | 0 | 168,101.45 |
| 1994 | 0 | 0 | 187,764.04 |
| 1995 | 0 | 0 | 169,754.13 |
| 1996 | 0 | 0 | 230,498.14 |
| Total | 12,775.41 | 199,616.33 | 934,933.11 |

### Lifestyle of the Debtors During the Relevant Year

The Debtors lifestyle appears to have been extravagant, through the use of several credit cards at Bloomingdale's, Neiman Marcus, Lord & Taylor, and American Express. (Govt.Exh. 30). It is evident from the record that the Debtors used the P.C. basically as their private bank, disregarding the separate legal existence of the P.C. from themselves, and indiscriminately using funds from the P.C. whenever needed. For instance, a cursory review of Government's Exhibit 60, a copy of checks issued from the P.C., show checks issued to "Cash," in excess of $76,000; "Paul Landi," in excess of $17,500; "John Landi," in excess of $22,250; "Phyllis Landi," in excess of $44,625; "Bloomingdales," in excess of $23,000; "American Express," in excess of $24,000; and other entities such as Sears and Home Depot, in excess of $6,000. (Govt.'s Exh. 60).

### Treatment of Trust Fund Taxes by the Debtors

The undisputed facts established by the testimony of the two accountants of the Debtors, Richard Hayden and Terry Lazar, reveal a startlingly graphic paradigm of the most cavalier attitude of a fiduciary dealing with the obligation of a corporate employer to withhold and pay over to the Government the trust fund taxes. The Debtor, Dr. Landi, was the sole "responsible person" within the meaning of 26 U.S.C. § 6672. As such, he was subject to the 100% penalty assessment if he did not fulfill his obligation as the responsible person.

As noted earlier, in the present instance, beginning the year 1994, the Debtor received less by way of salary and more by way of "non-wage" income from the P.C. Therefore, there were no funds withheld from the monies he received from the P.C. The record reflects that although there were few quarterly returns filed by the P.C., the P.C. paid very little in payroll taxes. In preparing the Debtors' income tax return at the end of the year, the accountant testified that there was always a problem in calculating the amount, which had to be treated as salary of what the Debtor received during any given year, and then determining the proper withholding on that amount.

For instance, in one particular year, the Form 941 reported a salary of $85,000. There should have been withholding on his income, which in turn, would have shown up as a credit on the Debtors' Form 1040 tax return. However, in the present instance, the P.C. did not withhold anything and of course did not pay over any of the amounts required to be withheld. This practice continued consistently by the Debtor, who was the principal of the P.C. and the "responsible person," not withstanding that the Debtors were warned repeatedly by both accountants of the inadvisability of this practice. Both accountants told the Debtors that this practice was improper and warned them about the consequences of their failure to comply with the requirement of the Internal Revenue Code concerning treatment of trust fund taxes by an employer, the P.C. (Db.'s Exhs. 26 and 29, Depositions of Richard Hayden and Terry Lazar).

Mrs. Landi, who was basically in charge of the finances of the P.C., decided that it was easier to maintain one bank account for the P.C. and for the Debtors. The Debtors used that account, not only to pay the business expenses of the P.C., but also to pay the family's personal expenses, which ultimately had to be classified as salary earned by Dr. Landi, subject to withholding. Of course, as noted above, this was not done. Hence, the tax liability

of the Debtors for the 100% penalty assessment was constantly growing bigger and bigger.

The Debtors attempt to make the point that there is nothing illegal or improper in treating a professional in a P.C. as an independent contractor and not as an employee, which is technically correct. However, this is true provided that the individual professional files a quarterly estimated tax return and pays the amount. Moreover, the estimated amount has to be proper and not underestimated when he files his annual tax return and reports the amount received on Schedule C as income earned not from employment.

On the other hand, if he is treated as an employee and receives a salary, it is the obligation of the employer, here the P.C., to make an appropriate withholding and pay the amount of payroll taxes to the Government on the quarterly returns. If the P.C. fails to do so, then the funds not collected cannot be reported as a credit by the individual. The P.C. is liable for the trust funds, but so is the individual who is pursuant to 26 U.S.C. § 6672, the "responsible person." This person will likewise be subject to a 100% penalty for failure to pay over to the Government the trust fund taxes.

Since in the present instance, neither the Debtors filed quarterly estimated tax returns and paid the same, nor were the trust fund taxes paid over to the Government, the Debtors are not entitled to receive a credit for the same on their individual tax returns.

It is evident from the foregoing that it is shear sophistry to argue that the procedure followed by the Debtors was proper over the years in question because neither requirements of the two alternatives were followed nor complied with in spite of the repeated admonition and advice by both accountants of the consequences of the failure to comply with the requirements of the Tax Code.

### Government's Argument and Debtors' Defenses

The Government contends that the evidence fully supports its claim that the Debtors have purposefully evaded their tax liabilities for the years in question based upon the following facts: (1) that the Debtors used the P.C. to shield cash from the IRS levy, so that the P.C. would pay all of their personal expenses; (2) that the Debtors fraudulently claimed withholding credits against their income knowing that the P.C. was not paying the corresponding Form 941 taxes; (3) that the Debtors failed to pay estimated taxes or to pay any income taxes with their tax returns while maintaining a lavish lifestyle; and (4) that the Debtors failed to account for jewelry and other personal property that could have been levied on.

In defense, the Debtors argue that the Debtors' inability to pay their taxes is caused by the following: (1) the misappropriations of funds by their accountant, Dennis King from 1981 through 1987; (2) the purchase of their "dream home" on Titicus Road; and (3) the failure of the Debtors to curb their personal spending. Although at trial, this Court ruled that the claimed embezzlement of Mr. King was inadmissible as irrelevant, the Debtors admitted into evidence the deposition transcripts of John W. Moscow, Deputy Chief, Investigations Division, New York County District Attorney's Office and Peter T. Goodrich, Esq., both of whom testified about Mr. King's alleged embezzlement. (Db.'s Exhs. 28 and 27, respectively).

This Court has considered the testimony adduced at trial, the evidenced admitted at trial, the post-trial briefs of the parties, and the governing principles of law, and is satisfied that the Government

has sustained its burden of proving that the Debtors purposefully evaded the payment of taxes.

■ Section 523(a)(1)(C) of the Bankruptcy Code provides as follows:

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

. . .

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax . . .

11 U.S.C. § 523(a)(1)(C). The burden is on the Government to prove its case by a preponderance of the evidence. *In re Griffith*, 206 F.3d 1389, 1396 (11th Cir.) (en banc) (*citing Grogan v. Garner*, 498 U.S. 279, 287–288, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)) (2000).

■ Under applicable law interpreting Section 523(a)(1)(C) of the Code, the Government must satisfy a two-prong test. First, the Government must show that the Debtors engaged in conduct, either acts of commission or acts of omission, to avoid the payment or collection of taxes. *In re Fretz*, 244 F.3d 1323, 1329 (11th Cir.2001). Second, the Government must show that the conduct engaged by the Debtors was willful. *Fretz*, 244 F.3d at 1330. In this context, willfulness means (1) the debtor had a duty under the law, (2) the debtor knew he/she had the duty, and (3) the debtor voluntarily and intentionally violated that duty. *In re Griffith*, 206 F.3d at 1396.

■ With respect to the first prong, the conduct requirement, under *Fretz*, the Eleventh Circuit re-examined its prior decisions dealing with this exception. In *In re Haas*, 48 F.3d 1153 (11th Cir.1995), *abrogated in part, In re Griffith*, 206 F.3d at 1395–96, the Eleventh Circuit held that

a debtor's failure to pay taxes alone did not fall within the scope of Section 523(a)(1)(C)'s exception to discharge and it also held that Section 523(a)(1)(C) did not cover attempts to evade or defeat the payment or collection of taxes. *Fretz*, 244 F.3d at 1327–1328, *citing Haas*, 48 F.3d at 1159. However, the Eleventh Circuit overruled that part of *Haas* in *In re Griffith*, 206 F.3d 1389 (11th Cir.) (en banc), *cert. denied*, 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 37 (2000). In *Griffith*, the Eleventh Circuit determined that Section 523(a)(1)(C) precludes discharge when a debtor "willfully attempts to evade or defeat a tax at the payment stage." *Fretz*, 244 F.3d at 1328, *citing Griffith*, 206, F.3d at 1393, 1395–96. Under *Fretz*, the Eleventh Circuit determined that the law of this Circuit is that the conduct requirement is satisfied when a debtor engages in affirmative acts to avoid payment or collection of taxes *as well as* acts of omission. *Fretz*, 244 F.3d at 1329 (emphasis added).

In *Fretz*, Dr. Fretz argued that he simply failed to pay his taxes; however, the Eleventh Circuit disagreed. Dr. Fretz was an alcoholic who failed to pay taxes and file his tax returns. The Eleventh Circuit held that the plain statutory language reads that the modifying phrase "in any manner" means what it says, and covers attempts to evade or defeat a tax whether accomplished by acts of culpable omission or acts of commission. *See also, In re Fegeley*, 118 F.3d 979 (3d Cir.1997) and *In re Toti*, 24 F.3d 806 (6th Cir.1994). The Eleventh Circuit indicated that this holding did not overrule *Haas*, inasmuch as the fact pattern in *Fretz* was different than in *Haas*. In *Fretz*, Dr. Fretz neither filed his tax return nor paid his taxes, whereas in *Haas*, the debtor filed the return but did not pay. *Fretz*, 244 F.3d at 1329.

While it is true that if one oversimplifies the fact pattern here, one can readily conclude that this is nothing more than a case of a debtor who knew the taxes were due, who had the money to pay the taxes, but failed to pay the taxes, and therefore, under *Haas*, the liability would not be excepted from the discharge. However, this would be an oversimplification of the fact pattern in this instance for the following reasons.

First, in the beginning of the relevant time period, the Debtors very well knew that they were already heavily indebted to the Government, due to the claimed embezzlement of their accountant of substantial sums. Notwithstanding, they embarked on extremely ambitious undertakings involving very substantial financial involvements, well knowing that the obligation undertaken in conjunction with several pieces of real estate would create a new additional financial burden upon them.

Second, while it is true that during the first four years, they filed all of the proper tax returns and treated income from the P.C. as wages of an employee, the fact remains that they made no meaningful attempt to meet their obligations in the years in question. The Debtors did not file estimated quarterly returns for their non-wage income. Dr. Landi's very substantial income was used for the purchase of their dream house on Titicus Road, an opulent dream house. The most telling part of this picture was when the Debtors sold their property on Bedford and realized approximately 1.5 million and instead of paying, at least some of it to the Government, used the funds as part of the purchase of their dream house, which required monthly mortgage payments of $23,000 and $80,000 in real estate taxes a year. This was the first gigantic step towards the entire pervasive pattern for a

blatant disregard of their obligation to pay the taxes and use the very substantial earnings of the Debtor to feed their uncontrollable appetite for a lavish life-style.

Third, and to further facilitate their lavish lifestyle and feeding upon their seemingly uncontrollable spending from 1994 onward, the Debtors no longer properly allocated their monies earned by Dr. Landi as wages but treated all as non-wage income. They disregarded the separation of the two entities and ran all funds through the P.C. account. This Court is constrained to reject the proposition urged by counsel of the Debtors that this is common practice, and so long as at the end of the tax year, there is a proper allocation between earned income as employment and earned income not as employment, the result is that this practice is permissible. This is true provided that if all income is from non-wages, the taxpayer *files* the quarterly tax return and pays the estimated taxes (emphasis added). The Debtor did not file nor pay any estimated amounts. Moreover, by not properly reporting the monies earned by the Debtors as wages, the P.C. was relieved of the obligation to withhold and pay employer's payroll tax. To further highlight this scheme, the Debtors claimed a credit for withholding they finally reported as part of Dr. Landi's income as wages, yet little to no withholdings were made from the P.C. or paid over to the Government.

So viewing the totality of the picture, this Court is satisfied that it is proper to infer that the Debtors embarked on an elaborate willful scheme to not live up to the obligations of paying their taxes. Therefore, under *Fretz*, the facts established by this record clearly support this conclusion. This Court is satisfied that the Government has met its burden.

A separate Final Judgment will be entered in accordance to the foregoing.