**In the Matter of Richard Carson PETERSON, Debtor.**

**Richard Carson Peterson, Plaintiff,**

v.

**United States of America, Defendant.**

**Bankruptcy No. 03–65019.
Adversary No. 03–9124.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Nov. 9, 2004.

---

Howard D. Rothbloom, Howard D. Rothbloom, Marietta, GA, for debtor.

_____

*ORDER DETERMINING PLAINTIFF'S UNPAID FEDERAL INCOME TAX OBLIGATIONS FOR TAX YEARS 1992, 1993, 1996, 1997, and 1998 ARE NOT DISCHARGEABLE*

MARY GRACE DIEHL, Bankruptcy Judge.

This matter is before the Court on the Adversary Proceeding (the "Complaint") filed by Richard Carson Peterson (hereinafter the "Plaintiff"). The Plaintiff seeks a determination as to the dischargeability of his unpaid federal income tax obligations for tax years 1992, 1993, 1996, 1997 and 1998. A trial on the matter was held on August 16, 2004. The Court, having considered the pleadings, briefs and other documents submitted by the parties, as well as the testimony elicited at the trial, hereby determines that the Plaintiff's unpaid tax obligations are not dischargeable pursuant to 11 U.S.C. Section 523(a)(1).

## FINDINGS OF FACT

The Plaintiff filed his Chapter 7 case on April 4, 2003. On April 22, 2003, the Plaintiff initiated this adversary proceeding against the United States requesting the court to determine that his unpaid federal income tax obligations for tax years 1992, 1993, 1996, 1997 and 1998 were not excepted from discharge under 11 U.S.C. Section 523(a)(1). The amount of the Plaintiff's unpaid federal income taxes, plus accrued interest and penalties, is approximately $520,175.24. The Government has stipulated that the Plaintiff's income tax returns for each year at issue were filed more than two years before the Petition Date, the due dates for each year were more than three years pre-petition, and all the tax obligations at issue were assessed more than 240 days pre-petition.

*Plaintiff's Tax Situation*

The Plaintiff is a highly-educated businessman who was employed as a healthcare consultant for various entities during the relevant tax years. In addition to working some years as an employee, he also maintained his own business for some duration of this time whereby he performed consulting work as an independent contractor. Through his employment and consulting business, the Plaintiff had maintained substantial earnings between 1992 and 1998. More specifically, the Plaintiff's adjusted gross income during the relevant tax years was as follows: $381,765 in 1992; $162,164 in 1993; $413,825 in 1996; $203,374 in 1997; and $204,346 in 1998.

Though having substantial earnings, the Plaintiff consistently failed to make sufficient estimated payments and withholdings toward his tax liabilities for each of the relevant years. In 1992, the Plaintiff owed $111,034 in taxes but had only paid $31,552 through estimated payments and withholdings. In 1993, he owed $46,389 in taxes but had only paid $38,758 via withholdings prior to assessment. In 1996, he owed $158,729 in taxes but had only paid $44,000 in estimated tax payments. In 1997, he owed $80,261 in taxes, including self-employment taxes, but as of his assessment had only paid $27,500 in estimated taxes. In 1998, he owed $63,807 in taxes, again including self-employment taxes, but prior to the assessment date he had only paid $9,325 via withholdings. In addition to not paying sufficient amounts through estimated payments and withholdings prior to assessment for these years, Plaintiff also neglected to pay the remaining obligations upon assessment. In response to the Plaintiff's failure to pay his taxes, the IRS filed three tax lien notices for Plaintiff's 1993, 1996 and 1997 unpaid taxes between July of 1995 and September of 1998.

Along with failing to make payments, there were some years when the Plaintiff was late in filing his returns. For 1992, the Plaintiff did not file his return until November 14, 1994, well beyond the extension date of August 15, 1993. In 1993, the Plaintiff did not file his return until August 22, 1994 when its due date was April 15, 1994. Again in 1996, the Plaintiff failed to file his return on time even though he received an extension date of October 15, 1997. After not receiving the Plaintiff's 1996 return by February 16, 1998, the IRS filed a Substitute for Return (hereinafter "SFR") whereby the Plaintiff's liability was assessed at zero. On April 21, 1998, approximately six months after its due date, the Plaintiff filed an "amended" return to the 1996 SFR.

To address his tax delinquencies, the Plaintiff hired Bill Fritton (hereafter "Fritton") with Equity Search sometime in March or April of 1995. In order to have Fritton deal directly with the IRS on his behalf, the Plaintiff executed a Form 2848 granting Fritton a power of attorney to act on his behalf. With Fritton's assistance, the Plaintiff entered into an Installment Agreement with the IRS whereby he was to make monthly payments of $150 towards his back taxes. From August of 1995 to July of 1998, the Plaintiff made 36 payments totaling $5,400 under this agreement, but around July of 1998 he stopped making the monthly payments.

In addition to the Installment Agreement, in 1998 Fritton also assisted the Plaintiff in attempting to reach a compromise with the IRS for the total amount of his tax delinquencies. During these negotiations, the IRS requested Plaintiff, through Fritton, to provide it with various financial data and employment information in order to reach a settlement. Fritton was late in responding to these requests and failed to disclose the name of a hospital where the Plaintiff was working during the negotiations.

Ultimately, these negotiations led to three offers of compromise by the Plaintiff, but each was rejected by the IRS. There were two offers by the Plaintiff on August 10, 1999 and December 21, 2000 for $15,000. These were rejected by the IRS after a determination that the Plaintiff could pay more than this amount given his financial situation when the offer was made. A third offer was made to increase the offer to $50,000, but this too was rejected by the IRS on similar grounds.

*Debtor's Lifestyle During the Relevant Years*

During the time span when the Plaintiff was failing to pay his tax obligations, he

maintained a lifestyle that consisted of perpetual shopping sprees, fine dining, expensive entertainment and extensive travel. It was not uncommon for the Plaintiff to charge thousands of dollars on his American Express, Neiman Marcus or Diner's Club credit cards within the time span of one week. Even while he did not pay his taxes, the Plaintiff managed to make monthly payments towards his credit card bills from his personal checking account during the relevant years.

For example, between 1996 and 1998 when he was neglecting his tax responsibilities, the Plaintiff made regular payments to American Express totaling approximately $255,000. On a similar note, in August of 1999 when the Plaintiff was making an offer of $15,000 to settle his tax delinquencies of $336,147.92, he made a payment to American Express in the amount of $10,263.09. Again, in December of 2000 when the Plaintiff made a second offer of $15,000 to settle his bill of $506,000 with the IRS, he made a payment to American Express in the amount of $7,220.42.[1]

Additionally, there were numerous purchases made for women's clothing, perfumes and fine jewelry. The Plaintiff testified that these items were charged on his card by himself and his companion, Julia Kenney (hereafter "Kenney"), for the benefit of Kenney, but she later reimbursed him for the charges. However, the Plaintiff did not offer any documentation to show Kenney later reimbursed him for the charge card purchases that were allegedly made on her behalf. In fact, the credit cards were paid off with checks from the

Plaintiff's personal checking account, and there is no indication on his bank statements that deposits were placed in his account to reimburse him for these charges. Further, the Plaintiff failed to list any outstanding balances remaining on these alleged "loans" in his bankruptcy schedules.

Another aspect of the Plaintiff's lifestyle that is unique is that even though he spent tens of thousands of dollars on credit card purchases, he accumulated no assets from 1992 to the present. He testified that he has nothing to show currently for all the purchases that were made on his credit cards. Further, instead of purchasing a home or buying a car, he chose to "rent" housing and "lease" cars from Kenney during this time. The Plaintiff offered no documentation as evidence to support that these agreements between him and Kenney were legitimate. To the benefit of the Plaintiff, the IRS had tax liens against the Plaintiff but no assets that could be attached.

### CONCLUSIONS OF LAW

Section 523(a)(1)(c) of the Bankruptcy Code provides that a discharge under section 727 of the Code is not allowed for tax liability with respect to which the debtor "willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(c). However, the general rule is that discharge is to be strictly construed in favor of the debtor. *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir.2000). Therefore, the government bears the burden to prove, by a

1. Plaintiff testified that his financial obligations under a divorce decree entered into in 1993 limited his available funds to pay his taxes as they came due. However, this financial burden did not prevent him from making substantial payments towards his credit card balances in order to maintain his spending habits. Further, it is unlikely that the court entering the divorce decree did not take into consideration the Plaintiff's tax liabilities when determining what amount he could afford to pay in alimony and child support. Thus, this testimony is not persuasive to the Court.

preponderance of the evidence, that a particular claim is not discharged pursuant to section 523(a)(1)(c). *Id.* at 1396.

■ Section 523(a)(1)(c) contains both a conduct and mental state requirement. *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1327 (11th Cir.2001); *see also Gardner v. United States (In re Gardner)*, 360 F.3d 551, 558 (6th Cir.2004); *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 983 (3d Cir.1997); *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir.1996). The conduct requirement is that the debtor "attempted in any manner to evade or defeat [a] tax," while the mental state requirement is that this attempt was done "willfully." *In re Fretz*, 244 F.3d at 1327.

I. *The Government has Satisfied the Conduct Requirement of 523(a)(1)(C)*

■ Congress did not define or limit the methods by which a debtor could willfully attempt to defeat or evade his taxes. *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). Therefore, when determining whether tax obligations are dischargeable under the Bankruptcy Code, courts look to the totality of the debtor's circumstances and the individual facts surrounding that debtor's case. *United States v. Spiwak (In re Spiwak)*, 285 B.R. 744, 749 (S.D.Fla.2002).

■ The conduct requirement under section 523(a)(1)(c) encompasses acts of omission by the debtor as well as affirmative acts to evade tax liability. *Fretz*, 244 F.3d at 1330; *see also Griffith*, 206 F.3d at 1394; *Toti v. United States (In re Toti)*, 24 F.3d 806, 809 (6th Cir.1994). However, the mere nonpayment of tax liability, though relevant evidence under the totality test, is not sufficient to warrant an exception from discharge under section 523(a)(1)(c) without more. *Fretz*, 244 F.3d at 1328; *Haas v. IRS*, 48 F.3d 1153, 1156 (11th Cir.1995); *see also Birkenstock*, 87

F.3d at 951; *Dalton v. IRS*, 77 F.3d 1297, 1301 (10th Cir.1996). Nevertheless, the Eleventh Circuit has determined that the conduct requirement is satisfied under section 523(a)(1)(c) when a debtor fails to pay tax obligations if it is coupled with a failure to also file tax returns. *In re Fretz*, 244 F.3d at 1329.

■ Here, the record shows that the Plaintiff's omissions go beyond merely not paying his tax obligations for the years in issue. In addition to underwitholding taxes, failing to pay estimated taxes, and failing to pay assessed taxes for tax years 1992, 1993, 1996, 1997 and 1998, the Plaintiff also neglected to timely file tax returns for tax years 1992, 1993 and 1996. Even after receiving an extension to file his returns well after the original due date for both 1992 and 1996, the Plaintiff still neglected to file these returns by the extension date. In fact, the Plaintiff did not file his 1996 tax return until a Substitute for Return (or "SFR") was filed by the IRS on February 16, 1998. It was only after the SFR was filed that the Plaintiff decided to take action by submitting an "amended return" on April 21, 1998.

Further, the Plaintiff has offered no reasonable excuse for his excessive delays in filing these returns. The only explanation offered by the Plaintiff was a pending divorce that was finalized in July of 1993. Even if this would explain his delay in filing his 1992 return, it does not excuse his failure to file both his 1993 and 1996 returns by their due dates. The Plaintiff is a highly-educated businessman whose adjusted gross income was no less than $150,000 for each tax year at issue. He had both the means to pay his taxes and the ability to file his returns within the given time periods. Due to the Plaintiff's conscious failure to both file his tax returns when they came due and pay his tax

obligations, this Court is satisfied that the Plaintiff's omissions were those of one trying to evade tax obligations.

■ Even if the Plaintiff's omissions were not sufficient to satisfy the conduct requirement, his affirmative acts warrant such a finding. The conduct requirement is satisfied where the debtor engages in affirmative acts, other than the nonpayment of taxes, to avoid payment or collection efforts by the IRS. *Griffith,* 206 F.3d at 1395. In this case, the Plaintiff's annual adjusted gross income was between $160,000 and $400,000 during each tax year at issue. However, even though maintaining a substantial income, he managed to avoid collecting any assets that could be subject to levy by the IRS for his delinquent taxes. It is suspicious that instead of accumulating assets between 1992 and 1998, the Plaintiff chose to "lease" cars and "rent" housing from Kenney. This Court is persuaded that the Plaintiff's failure to accrue assets over this seven year time frame was an attempt to avoid collection efforts by the IRS.

Considering the Plaintiff's failure to pay his tax obligations, failure to timely file his taxes for three years, and failure to accumulate assets when he had the financial means, this Court is satisfied that the IRS has established by a preponderance of the evidence that the Plaintiff's conduct was that of one attempting to evade and defeat tax obligations. Accordingly, the conduct requirement under section 523(a)(1)(c) has been satisfied.

II. *The Government has Satisfied the Mental State Requirement of 523(a)(1)(c)*

■ In addition to establishing conduct by the debtor that equates to an attempt to evade tax obligations, the government must also establish that the debtor "willfully" engaged in the conduct under section 523(a)(1)(c). However, the government does not have to establish that the debtor had fraudulent intentions in order to satisfy the mental state requirement. *Fegeley,* 118 F.3d at 984. A debtor's attempt to avoid tax liability is "willful" if it is done voluntarily, consciously or knowingly, and intentionally. *Griffith,* 206 F.3d at 1396–97; *see also Tudisco v. United States (In re Tudisco),* 183 F.3d 133, 137 (2d Cir.1999); *Fegeley,* 118 F.3d at 984; *Birkenstock,* 87 F.3d at 952; *Dalton,* 77 F.3d at 1302; *Toti,* 24 F.3d at 809.

■ To satisfy the mental state requirement, the IRS must establish that (i) the debtor had a duty to file tax returns and pay the tax obligation under the law; (ii) the debtor knew he had that duty and (iii) the debtor voluntarily and intentionally violated that duty. *Griffith,* 206 F.3d at 1396; *see also In re Bruner,* 55 F.3d 195, 197 (5th Cir.1995); *Birkenstock,* 87 F.3d at 952. Given that there is no dispute that the Plaintiff in this case had a duty to file and pay his taxes, as well as the fact that the Plaintiff was aware of his duty to file and pay, the only issue is whether the Plaintiff voluntarily and intentionally failed to fulfill these duties.

■ In cases of this nature, direct evidence is rarely available to prove the intent of a debtor. Therefore, courts rely on certain types of conduct sometimes called "badges of fraud" that provide an indicia of a "willful" evasion by the debtor to defeat or evade his or her tax liability. This conduct may include (i) the understatement of income for more than one tax year; (ii) implausible or inconsistent behavior; (iii) the debtor's failure to cooperate with the IRS; (iv) inadequate record keeping; (v) transfers of assets for inadequate consideration; (vi) transfers that greatly reduce assets subject to IRS execution and (vii) any other conduct that is

likely to mislead or conceal. *In re Griffith*, 206 F.3d 1389 (11th Cir.2000); *In re Hassan*, 301 B.R. 614, 622 (S.D.Fla.2003) [(quoting *In re Spiwak*, 285 B.R. 744, 751 (S.D.Fla.2002))]; *see also United States v. Sternberg (In re Sternberg)*, 229 B.R. 238, 246 (S.D.Fla.1998); *Huber v. IRS (In re Huber)*, 213 B.R. 182, 184 (Bankr.M.D.Fla. 1997). Not one of these factors is determinative since the court considers the totality of the circumstances in each individual case. *Hassan*, 301 B.R. at 623. However, the presence of multiple factors gives rise to a rebuttable presumption of willful evasion. *Id.* at 621.

 In this case, the Plaintiff has exhibited implausible and inconsistent conduct through a lack of asset accumulation and spending habits, has failed to cooperate with the IRS on various occasions, and has made asset transfers identified as "loans" without adequate documentation. These factors, when viewed in totality, establish a presumption of a voluntary, knowingly and intentional avoidance of tax liability by the Plaintiff.

### A. Plaintiff Exhibited Implausible and Inconsistent Conduct

There are at least two ways in which the Plaintiff exhibited implausible and inconsistent conduct. First, as addressed above, between 1992 and 1998, the Plaintiff did not acquire any significant assets that could be levied against by the IRS for his delinquent taxes. Considering the Plaintiff's significant earnings during this seven year time span, the Court finds that the Plaintiff's failure to collect any attachable assets is an exhibit of implausible and suspicious behavior.

 Moreover, in addition to not collecting any attachable assets over the years, the Plaintiff was able to maintain a lavish and extravagant lifestyle of luxury shopping sprees, fine dining, expensive entertainment and vacationing while simultaneously failing to fulfill his tax obligations. Even though not conclusive as to whether tax debts will be discharged under the Code, a debtor's spending habits during the tax years in issue are relevant under the totality test. *Landi v. United States (In re Landi)*, 289 B.R. 173, 182 (Bankr. M.D.Fla.2002).

In *Landi*, the debtors, who maintained substantial earnings during the tax years in issue, made credit card purchases exceeding tens of thousands of dollars at Bloomingdale's, Neiman Marcus, Lord & Taylor and other establishments using credit from American Express. *Id.* at 179. During the time the debtors had the funds and credit to spend thousands of dollars on luxury items, they simultaneously neglected to pay their tax liabilities as they came due. *Id.* Concluding that the debtors' blatant disregard for their obligation to pay taxes while using their substantial earnings to maintain a lavish lifestyle was willfully evasive, the court denied the debtors' request for discharge of their tax liabilities. *Id.* at 182.

Similar to the debtors in *Landi*, the Plaintiff regularly charged thousands of dollars on credit cards for luxury items, fine dining, entertainment and personal travel during the time he could have been making payments towards his taxes. While the Plaintiff was charging over tens of thousands of dollars for personal luxuries, he failed to keep up with his estimated taxes and withholdings, and only managed to pay a total of $5,400 towards his back taxes. This amount is trivial when compared to the $506,000 he owed in delinquent taxes and the excessive amounts he was charging to his Diners Club, American Express and other credit cards.

In addition to making these excessive credit card purchases, the Plaintiff was

regularly making payments in the thousands to these credit card companies. It was not unusual for the Plaintiff to make a monthly payment towards his American Express card that exceeded $5,000. If the Plaintiff could afford to write checks of this caliber to keep good standing with his credit cards, he could have paid more than $5,400 towards his delinquent taxes. Thus, like the court in *Landi,* this Court is satisfied that the Plaintiff's disregard for his tax obligations during a time when he was maintaining a lavish and extravagant lifestyle is evidence of a willful attempt by the debtor to avoid his tax responsibilities.

### B. Plaintiff Failed to Cooperate with the IRS

In addition to his extravagant spending, there were numerous instances when the Plaintiff did not cooperate with the IRS. Initially, he failed to file his tax returns after he was given extensions of time in which to do so for both 1992 and 1996. Further, Plaintiff ceased making payments on a voluntary Installment Agreement with payments of $150 per month after 36 months. Given that the Plaintiff had annual earnings averaging between $130,000 to $413,000 when he defaulted on the payment plan, the Court is convinced that the Plaintiff was able to make the $150 monthly payments and was uncooperative when he failed to complete the plan as agreed.

Moreover, the Plaintiff has acknowledged that there were occasions during the time period when the parties were trying to negotiate an offer and compromise where his agent failed to provide the IRS with requested financial information in a timely manner and refused to provide full disclosure of the Plaintiff's employment. The Plaintiff responds to this by arguing he is not at fault for the actions of his agent, but this is not persuasive under agency principles. When a taxpayer executes a power of attorney and declares a representative on his behalf, the taxpayer is normally bound by his agent's conduct performed under the power of attorney, unless he can provide evidence to the contrary. *Lavine v. Comm'r of Internal Revenue Service,* T.C. Memo.1995–270, 1995 WL 363208 (1995)(collecting cases). The Plaintiff's execution of a valid Form 2848 providing Fritton with a power of attorney as his representative bound the Plaintiff to any uncooperative conduct by Fritton as if it were his own. Since the Plaintiff has provided no evidence that the Form 2848 was revoked or no longer in effect when Fritton acted on his behalf, he is bound by Fritton's uncooperative conduct. Thus, the Plaintiff's failure to timely provide the government with financial information and full disclosures further supports the IRS's position that there was a "willful" evasion.

The government also argues that the Plaintiff's offers to compromise were not made in good faith but instead made as a mechanism to stall any collection procedures that could have been made by the IRS during this time. It is obvious that an offer of $15,000 to resolve an obligation in excess of twenty times that amount can only be considered minimal. While standing alone this fact may not prove intent, the Plaintiff's tardiness in filing returns, failing to continue payments under the Installment Agreement and uncooperative conduct through his agent is sufficient to support the position that the Plaintiff did not cooperate with the IRS.

### C. Plaintiff Engaged in Transfers of Assets without Adequate Record Keeping

Another factor of the totality test exhibited in this case is a transfer of assets to others without adequate explanation or documentation. Courts consider these transactions when determining if there has

been a "willful" evasion of tax obligations by the debtor. *Hassan*, 301 B.R. 614, 620. Here, the Plaintiff made a substantial number of asset purchases on his credit card. Since the Plaintiff testified that these assets were not in his possession and failed to provide evidence as to where the assets are currently located, the Court can only assume that these assets are in Kenney's possession due to the nature of these assets and the Plaintiff's relationship with Kenney. The Court is not persuaded by the Plaintiff's testimony that most of these purchases were "loans" to Kenney for which he was reimbursed.

In *Hassan*, the debtors transferred money to their daughter under the guise of "loans" without an explanation as to the transfer or documentation supporting consideration for the transfer. *Id.* In addition to these transfers, the debtors failed to acquire significant assets, failed to timely file tax returns, defaulted on a payment schedule and spent thousands of dollars on luxury items, personal property and travel. *Id.* at 621. Finding the transfers inadequately explained and unsupported, the court concluded that the debtor intentionally conducted their lives in a manner to avoid collection efforts by the IRS. *Id.*

The Plaintiff's case is almost identical to that of the debtors in *Hassan*. Like the debtors in *Hassan* who could not adequately explain their transfers, the Plaintiff has not convinced this Court that all of the purchases he claims to have made on behalf of Kenney were loans. As the IRS pointed out, the number of lavish purchases made by the Plaintiff calls into question the Plaintiff's testimony that these purchases were all loans. Further, and more importantly, the Plaintiff put forth no documentation to support the notion that he was reimbursed for these purchases. His account records indicate that he used money out of his personal account to pay for these credit card purchases and there was no evidence to support Kenney made deposits in the Plaintiff's account as reimbursements.

Additionally, there is no documentation of these loans on the Plaintiff's bankruptcy schedules. Since there is nothing to support repayment of the loans by Kenney, the Court can only assume that if these were "loans" as alleged, they would have been outstanding and recorded on the Plaintiff's bankruptcy schedules as assets. However, this is not the case. Just as the debtors in *Hassan* could not document their transfers as loans, the Plaintiff has provided no evidence to support his testimony that Kenney borrowed money on his credit card for these extravagant purchases.

The Plaintiff seeks to distinguish *Hassan* on two basic theories, neither of which is persuasive to this Court. First, the Plaintiff argues that the debtors in *Hassan* made no payments toward their taxes, whereas he at least made estimated payments and withholdings during the relevant tax years. However, the Plaintiff is incorrect in stating that the debtors in *Hassan* did not make *any* payments towards their taxes. Like to the Plaintiff, the *Hassan* debtors made payments toward their back taxes under a payment plan entered into with the government until shortly before filing bankruptcy, but the amounts paid were not sufficient to satisfy their total debt. *Id.* at 618. Similarly, even though the Plaintiff paid in estimated payments and withholdings throughout each of the relevant tax years, these amounts were substantially insufficient when compared to his adjusted gross income for the given years.

The second distinction that the Plaintiff argues is that the *Hassan* court considered the debtors' extensive use of cash transactions as one factor when applying the to-

tality test of 523(a)(1)(c). The Plaintiff's theory is that since he did not transact business extensively in cash, his case is distinct. The Court does not disagree that the Plaintiff does not satisfy this factor under the totality test. However, this is just one factor among many that the courts consider when determining if a debtor has willfully evaded tax obligations. In fact, many of the factors considered by the court in *Hassan* are present here. For example, like the *Hassan* debtors, the Plaintiff did not acquire any significant assets over the relevant time, failed to timely file his tax returns, defaulted on a payment plan entered into with the IRS and spent thousands of dollars to maintain a lavish lifestyle of shopping sprees, fine dining and travel.

Viewing the totality of these factors along with the undocumented transfers to Kenney, this Court finds that there is sufficient facts to support the IRS's argument that the Plaintiff voluntarily, knowingly and intentionally sought to evade his tax obligations. Accordingly, the mental state requirement under section 523(a)(1)(c) has been satisfied.

### CONCLUSION

The government has established by a preponderance of the evidence that the Plaintiff willfully attempted to evade his tax liabilities for tax years 1992, 1993, 1996, 1997 and 1998. For the reasons discussed above, the Court finds that the Plaintiff's obligations for the tax years in issue are nondischargeable under section 523(a)(1)(c) of the Bankruptcy Code. Therefore, **IT IS HEREBY ORDERED** that the Plaintiff's tax deficiencies of $520,175.24 are nondischargeable under Section 523(a)(1)(c) of the Bankruptcy Code.

The Clerk's Office is directed to serve a copy of this Order upon the parties shown on the Distribution List.