**RAILWAY LABOR EXECUTIVES'
ASSOCIATION, et al.,
Plaintiffs–Appellants,**

v.

**SOUTHERN RAILWAY COMPANY,
Defendant–Appellee.**

**No. 87–8513.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 28, 1988.

Randall Blackwood, Randall Blackwood, P.C., Atlanta, Ga., Lawrence M. Mann, Alper & Mann, Washington, D.C., for plaintiff-appellants.

Sidley & Austin, Linzey D. Jones, James S. Whitehead, Chicago, Ill., Neely & Player, Haas–Howell, Edgar A. Neely, Jr., Atlanta, Ga., for defendant-appellee.

Before KRAVITCH, Circuit Judge, HENDERSON *, and HENLEY **, Senior Circuit Judges.

HENDERSON, Senior Circuit Judge:

Railway Labor Executives Association and seventeen individual railway unions (collectively, "the Unions") appeal from the order of the United States District Court for the Northern District of Georgia granting summary judgment in favor of the defendant Southern Railway Company ("Southern") in this action for injunctive relief brought pursuant to the provisions of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"). We affirm.

For approximately thirty years, Southern has required periodic, routine medical examinations that have included urinalyses. Originally, these urine samples were tested to determine the sugar and albumin levels of employees. Since 1974, the medical examinations have been mandatory for employees returning from furloughs of a specified length of time. Southern's revised medical standards for 1981 denied employment to employees who are dependent upon or use drugs that impair their sensory, mental or physical conditions.

It is undisputed that since about 1970 Southern began conducting periodic drug screening on urine samples taken during the course of routine medical examinations. In 1979, according to Dr. John P. Salb, Southern's Medical Director, the carrier's drug screening of urine specimens taken from routine medical examinations became more frequent. In 1983, Southern included testing for marijuana in its drug screens.

In October, 1984, Southern decided to impose drug testing on all urine specimens obtained during routine physical examina-

tions and return-to-work examinations. The carrier announced this policy to its employees and the unions representing them in February, 1985.

Under this policy, if an employee's tests results are positive for any of the prohibited drugs,[1] then that employee is held out of service without pay until he provides a drug-free sample. The employee has 45 days from the date of notification to supply a drug-free specimen. Noncompliance with this 45–day rule can lead to an employee's dismissal for failure to obey instructions. If, on the other hand, an employee submits a negative specimen within the 45–day period, then he is immediately considered fit for work and returned to duty.

In lieu of compliance within the specified time period, an employee whose test result is positive for drugs may enter the Norfolk Southern Drug and Alcohol Rehabilitation Services ("DARS") program. If an employee elects the DARS option, then he has five days from the end of the program to supply a clean sample. Again, failure to comply can result in termination.

From the commencement of the drug testing program to the time this action was filed, Southern performed over 4000 drug screens on urine specimens. During that time, slightly under six percent of those tests yielded a positive result. Of the employees who tested positively for drugs, more than ninety percent subsequently provided a drug-free sample and returned to work. Nine have been discharged for failure to supply a clean specimen.

On July 18, 1986, the Unions brought this action in district court to enjoin Southern from conducting drug screen urinalyses during routine medical examinations. They maintained that Southern's unilateral imposition of this drug testing procedure constituted a major dispute under the RLA, and, therefore, the district court had jurisdiction to enjoin the testing procedure

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The drug test seeks to detect the presence of amphetamines, methamphetamines, phenmetrazine, morphine, codeine, demerol, dilaudid, quinine, darvon, methadone, cocaine, phenobarbital, certain "short-acting" barbiturates, phencyclidine ("PCP"), methaqualone, phenothiazines and marijuana.

while settlement negotiations between the company and the union proceed as required by the Act. Southern moved for summary judgment urging that the dispute was minor and subject to the exclusive jurisdiction of the National Railroad Adjustment Board ("NRAB"). See 45 U.S.C. § 153. Additionally, Southern contended—in both its answer and summary judgment motion—that the applicable statute of limitations barred the Unions' action. Without discussing whether the complaint was time barred, the district court granted the carrier's motion. The Unions now appeal that order. Because we agree with Southern that the Unions failed to file this action during the relevant period within which the suit could be brought, we affirm.[2] Consequently, we need not reach the merits of the case.

■ The RLA contains no limitations period applicable to actions, such as the one before us, predicated on violations of its provisions. When a federal statute fails to provide such a limitations period, courts do not assume a legislative intent that all actions under the statute be timely. Rather, courts ordinarily borrow a suitable rule of timeliness from another source. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476, 485 (1983). Often, the most analogous statute of limitations is found in state law.

While federal courts generally prefer to borrow state limitations periods, they are not compelled to do so. *Id.* at 159–60 n. 13, 103 S.Ct. at 2288–89 n. 13, 76 L.Ed.2d at 45–46 n. 13. Indeed, the federal courts must decline to adhere to state limitations laws where doing so would impair federal policies. *Id.* at 161, 103 S.Ct. at 2289, 76 L.Ed.2d at 487. Where national interests are implicated, a need for national uniformity arises. Whether a uniform federal limitations period ought to apply to a particular type of action arising under a federal statute depends upon the relationship between the litigants' interests and the national policies promoted by the statute. If the interests of the parties are of especial concern to the federal policy, the need for national uniformity for the timeliness of such actions is compelling. In such cases, courts look to federal rather than state law for the appropriate limitations period, frequently applying a related federal statute's express rule or an alternative such as laches. *Id.* at 162, 103 S.Ct. at 2289, 76 L.Ed. 2d at 487.

Some actions involving the important national policies promoted by federal labor laws presently are subject to a uniform limitations period. In *DelCostello*, the Supreme Court examined hybrid suits brought by employees against their employers and unions. A hybrid suit combines a claim under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for an employer's breach of a collective bargaining agreement, with an action resting on a union's breach of the duty of fair representation implied under the scheme of the National Labor Relations Act. The Court characterized hybrid actions as direct challenges to one of "those consensual processes that federal labor law is chiefly designed to promote," *International Union, United Auto Aerospace and Agr. Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corp.*, 383 U.S. 696, 702, 86 S.Ct. 1107, 1111, 16 L.Ed.2d 192, 198 (1966): the private settlement of disputes under the collective bargaining agreement, *DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291, 76 L.Ed. 2d at 489. Searching for a state statute of limitations both analogous and appropriate, the Court found none. The strongest candidates, state limitations periods for vacating arbitration awards and for legal malpractice, loosely analogous at best, failed primarily because their application would hinder the policies of federal labor law, either by cutting off employees' rights too quickly, or by letting those rights linger too long, precluding "the relatively rapid final resolution of labor disputes favored by federal law...." *Id.* at 168, 103 S.Ct. at 2292, 76 L.Ed.2d at 491.

---

**2.** Although the district court did not rule on this issue, we are free to affirm on any ground supported by the record. *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314, 315 (1957).

Rejecting state law, the Court turned to a federal statute of limitations which it believed better balanced the parties' and the policies' interests: § 10(b) of the NLRA, 29 U.S.C. § 160(b). Section 10(b) provides that charges of unfair labor practices must be filed with the National Labor Relations Board within six months of the offending practice's occurrence. The Court reasoned that § 10(b) supplied the best analogy to the hybrid claims at issue in that case, because a union's breach of its duty to provide fair representation either is an unfair labor practice, or closely akin thereto. More important, the Court stressed that § 10(b) embodied Congress' view respecting the proper balance between the national and individual interests at stake, considerations common to the two related labor law contexts. Concluding that uniform procedures should govern similar claims, the Court adopted the six-month period specified in § 10(b) as the appropriate statute of limitations for hybrid breach of collective bargaining agreement/fair representation cases.

In the wake of *DelCostello*, circuit courts began using the six-month limitations period in actions brought under the RLA, particularly those founded on breach of the duty of fair representation implied by § 2, Fourth, 45 U.S.C. § 152, Fourth. See *Steele v. Louisville & Nashville Ry. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (union must represent nonunion or minority union members fairly and in good faith). These courts reasoned that fair representation cases under the RLA implicated policy considerations and litigant concerns

similar to the individual and national interests balanced by the Court in *DelCostello*. This reasoning persuaded every circuit addressing the issue, and as a result, six months became the almost uniform limitation period governing such actions. This court sided with seven other circuit courts of appeal[3] to so hold in *Smallakoff v. Air Line Pilots Assoc., International,* 825 F.2d 1544 (11th Cir.1987). In *Smallakoff,* this court favored a uniform limitations period, stressing the need for agreement among the circuits:

> There is no persuasive reason why the same limitations period should not be uniformly applied throughout the country. After seven United States Circuit Courts of Appeal have addressed arguments such as those presented here and have all held that a six-month statute of limitations period should apply, the other circuits should fall in line. With so many circuits having recently decided the issue in the same way, the bench and bar should be able to depend on the point as settled law without judge-by-judge reexamination of the issue.... If the public is dissatisfied with the consistent reasoning of the several courts of appeal, it should look to Congress for correction.

*Id.* at 1546.

The instant suit contains no fair representation claims. Rather, it involves violation of the duty to bargain collectively inferred from § 2, First[4] of the RLA, see *Chicago & Northwestern Ry. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), and breaches of the RLA's status quo provisions, § 2, Seventh[5]

**3.** See *Triplett v. Brotherhood of Railway, Airline and Steamship Clerks,* 801 F.2d 700 (4th Cir. 1986); *Brock v. Republic Airlines, Inc.,* 776 F.2d 523 (5th Cir.1985); *Ranieri v. United Transportation Union,* 743 F.2d 598 (7th Cir.1984); *Barnett v. United Airlines, Inc.,* 738 F.2d 358 (10th Cir.) (opinion on rehearing), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 594, 83 L.Ed.2d 703 (1984); *Welyczko v. U.S. Air, Inc.,* 733 F.2d 239 (2d Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984); *Sisco v. Consolidated Rail Corp.,* 732 F.2d 1188 (3d Cir.1984); *Hunt v. Missouri Pacific Railroad,* 729 F.2d 578 (8th Cir.1984).

**4.** Title 45 U.S.C. § 152, First, provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

**5.** Title 45 U.S.C. § 152, Seventh, states:

> No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner

and § 6.[6] Thus, *Smallakoff* arguably does not compel the application of a six-month limitations period here. However, the duty to bargain claims here, like fair representation claims, are grounded in § 2 of the RLA. Applying different limitations periods to actions springing from the same section of the RLA—albeit separate paragraphs of that section—would be anomalous. It would be equally inconsistent if we established a different limitations period for actions on the status quo provisions, because although "[d]ifferent sections of the Act are invoked ... they seem to cover the same ground, for the refusal to bargain consists in unilaterally—that is, without negotiations, without bargaining—altering the collective bargaining agreement." *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry. Co.,* 768 F.2d 914, 920 (7th Cir.1985) (Posner, J.). Moreover, the desire for consistency expressed by this court in *Smallakoff* prevails upon us to apply a six-month limitations period to all the causes of action embodied in the present case. Because these claims implicate "those consensual processes" primarily promoted by federal labor law, we hold that the six-month limitations period found in § 10(b) of the NLRA applies to actions brought under §§ 2 and 6 of the RLA for breach of the duty to bargain and violation of the status quo provisions.

Our position finds strong support in two other circuit courts of appeal, the Seventh and the Ninth. In its decision to draft the six-month statute of limitations in § 10(b) for service in an action brought under the RLA by an engineer's union alleging failure to bargain and unilateral disruption of the status quo, a unanimous panel of the Seventh Circuit Court of Appeals, recognizing that a borrowed § 10(b) already governed fair representation claims arising from the RLA, reasoned that "[a] refusal to bargain is a classic unfair labor practice [under the NLRA]. The analogy to section 10(b) is therefore even clearer than in cases alleging breach of a union's duty to represent workers fairly...." *Atchison,* 768 F.2d at 919. Similarly, in *International Assoc. of Machinists and Aerospace Workers, AFL–CIO v. Aloha Airlines, Inc.,* 790 F.2d 727, 733 (9th Cir.), superseding 781 F.2d 1400, *cert. denied,* 479 U.S. 931, 107 S.Ct. 400, 93 L.Ed.2d 354 (1986), the Ninth Circuit Court of Appeals applied § 10(b)'s six-month limitations period to a "combined claim for breach of the collective bargaining agreement and breach of the RLA's status quo provisions." The Ninth Circuit added a twist, however, by making its decision purely prospective not applicable even to the parties before the court. *Id.* at 736. See *Linkletter v. Walker,* 381 U.S. 618, 621–22, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601, 604 (1965).

The unions urge us to follow the Ninth Circuit court and fashion a purely prospective ruling if we are to adopt a limitations period of six months. In reaching its conclusion, the court relied upon *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), in which the Supreme Court constructed a three-tiered analytical framework for determining whether a judicial decision should be non-retroactive. Briefly, the issues to be considered under the *Chevron* doctrine are the novelty of the decision in question, whether

prescribed in such agreements or in section 156 of this title.

**6.** Title 45 U.S.C. § 156 requires:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

retroactive application will further or retard the new rule's operation and whether retroactive application of a decision would produce substantial inequitable results. *Id.* at 106–07, 92 S.Ct. at 355, 30 L.Ed.2d at 306. As the Ninth Circuit framed the issue, the question was not whether to apply *DelCostello* retroactively, because the Supreme Court had handed down *DelCostello* nine months before the *Aloha* litigation had begun, but whether to apply the circuit court's own decision to borrow the six-month limitations period to the case then under consideration. Reflecting on the *Chevron* factors, the court wrote:

> Our decision establishes a new principle of law because it extends the rationale in *DelCostello* to cases arising under the RLA, a question which we have previously not addressed. The holding in this case also extends *DelCostello*'s rationale to a case which is one step removed from the hybrid breach of collective bargaining agreement/fair representation action. It would be inequitable to impose a six-month limitations period on the [union] where it could not have known or foreseen our holding in the instant case.

*Aloha,* 790 F.2d at 736. While the Ninth Circuit conceded that retroactivity would further the purposes of the rule in question by promoting the prompt resolution of labor disputes, it nonetheless concluded that the other considerations—novelty and unfairness—outweighed *Chevron*'s policy prong. Although we acknowledge *Chevron*'s relevance [7]—it "counsels against retroactive application of statute of limitations

decisions in certain circumstances," *St. Francis College v. Al–Khazraji,* 481 U.S. 604, ——, 107 S.Ct. 2022, 2025, 95 L.Ed.2d 582, 589 (1987)—we decline to follow the Ninth Circuit Court of Appeals with respect to the question of prospective operation. For several reasons, we shall adhere to the "usual rule ... that federal cases should be decided in accordance with the law existing at the time of decision." *Id.* (citations omitted).

First, our examination of the *Chevron* factors bears a different fruit than that yielded by the Ninth Circuit. Our initial determination concerns the identity of the decision subject to the *Chevron* analysis. As was the situation in *Aloha,* the present case began long after the Supreme Court decided *DelCostello* in June, 1983. Therefore, if retroactivity be a problem, it is not caused by *DelCostello.* Likewise, *Smallakoff,* though decided after the commencement of this litigation, does not qualify for non-retroactive application. There, the court fell in line with a string of cases dating back to 1984, recognizing a principle whose novelty, if any, had worn off. Thus, as did the court in *Aloha,* we must decide whether our decision in the instant case should be non-retroactive. Utilizing the *Chevron* analysis, we first consider the novelty of our present holding. While our decision here is a marginal extension of the rulings in *DelCostello* and *Smallakoff,* it is consistent with those precedents to such an extent that it cannot be characterized as an entirely new principle of law.[8] Turning to

---

**7.** In *Chevron,* the court considered whether one of its earlier decisions, which overruled a long line of precedent, should be applied retroactively. The earlier decision, announced after the case under consideration had been filed, required that, in cases such as the one before the Court, state law supply the rule of limitation. Because the state statute of limitations was shorter than the federal limitations period upon which the claimant reasonably had relied, retroactive application of the prior decision would have barred the present action. Because of the unmistakable novelty of its prior decision, the Court's determination that retroactivity would frustrate the policy behind incorporating state law into the relevant federal statute, and its realization that barring an action which indisputably was timely when filed would be pat-

ently unfair, the Court held that its earlier decision would not be applied retroactively. *Chevron,* 404 U.S. at 106–08, 92 S.Ct. at 355–56, 30 L.Ed.2d at 306–07.

**8.** The Unions' argument that application of § 10(b) to the instant action would be a departure from prior law is based upon a mistaken view of statutes of limitations. The Unions argue that prior to the filing of their complaint, § 10(b) had been applied only in cases involving "minor" disputes and that, because the instant case involves a "major" dispute, application of § 10(b) would be new law. The Unions beg the question. The central issue on the merits is whether Southern's conduct has given rise to a major or a minor dispute, Thus, the Unions' claim that they relied on supposed distinctions

the second factor, which prompts us to study the reasons for the rule, we agree with the Ninth Circuit that policies underlying the federal labor law—including the promotion of prompt, private settlements of labor disputes—are advanced by the retroactive application of a decision to employ the six-month limitations period. Moreover, this second prong is particularly significant here, because the *DelCostello* decision's theoretical foundation principally consisted of the federal labor law policies. Finally, focusing on the equities of this particular case, we observe that our decision today was not unforeseeable. When the Unions filed this lawsuit, *DelCostello*, the progenitor of this decision, as well as *Smallakoff, Aloha, Atchison,* and a host of others, had been on the books about three years. Well before the causes of action here accrued, the winds of change, while perhaps not gale force, had become a steady, perceptible breeze. Our present decision will not produce substantial inequitable results. In sum, only the first *Chevron* factor suggests, without enthusiasm, that we make our holding purely prospective. Factors two and three both favor retroactivity, the former strongly, the latter less so. *Chevron* does not counsel against retroactivity here.

In addition, other courts which have borrowed § 10(b) have not fashioned purely prospective decrees. In *DelCostello* itself, the Supreme Court retroactively applied § 10(b)'s six-month limitations period to bar the action before the Court, and our research discloses no case in which another United States Court of Appeals has joined the Ninth in denying retroactive application to § 10(b). See *Smallakoff, supra; Welyczko, supra,* and cases cited therein. The losing litigants in those cases necessarily

"sustain[ed] a full blast of 'retroactivity,' otherwise the change in law [would have been] merely precatory and without full precedential force." *Noble v. Drexel, Burnham, Lambert, Inc.,* 823 F.2d 849, 850 (5th Cir.1987). With that in mind, we see no reason to depart from the usual rule and restrict our holding, perhaps limiting its precedential weight.

■ Having decided that the six-month provision of § 10(b) governs this action, and having determined that the litigants now before us are bound thereby we must settle upon the date that Southern notified the Unions of the urine testing policy in controversy, thus triggering the commencement of the statute of limitations.[9] The parties disagree as to when the statute began to run, but a review of the record indicates that the Unions' causes of action accrued no later than February 12, 1985, more than six months before this suit was filed on July 18, 1986.

As stated earlier, in October, 1984 Southern began to include a drug screen urinalysis as part of both its periodic routine physicals and return-from-furlough medical examinations. The parties agree that the Unions had notice at the latest on February 12, 1985, that urinalysis screening would be routine in all *periodic* medical examinations. The parties, however, disagree on the date when the Unions had notice of Southern's unilateral adoption of mandatory drug screening in *return-from-furlough* medical examinations. The Unions argue that they were not advised until January 31, 1986, that urinalysis testing would be mandatory in return-from-furlough medical exams.

This argument is misleading. The record before the district court discloses that, on

---

between major and minor disputes made by prior courts borders on the ridiculous.

**9.** "In the absence of fraud of concealment, § 10(b)'s six-month limitations period starts running when the claimant 'discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [violation]." *Howard v. Lockheed–Georgia Co.,* 742 F.2d 612, 614 (11th Cir.1984) (citing *N.L.R.B. v. Don Burgess Construction Co.,* 596 F.2d 378, 382 (9th Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct.

293, 62 L.Ed.2d 306 (1979) (brackets in original) (citations omitted)). As this court has explained, "[f]or the purpose of determining when the § 10(b) period begins to run, we look to when plaintiffs either were or should have been aware of the injury itself, not to when plaintiffs' [sic] became aware of one of the injury's many manifestations." *Howard,* 742 F.2d at 614 (citing *Benson v. General Motors Corp.,* 716 F.2d 862, 864 (11th Cir.1983)).

February 12, 1985, Southern sent to all its employees a letter that stated "[a]ll company physical examinations now include a drug screen urinalysis." On August 1, 1985, Southern's parent, Norfolk Southern, sent a similar but more detailed memorandum to all employees of both Southern and its sister company, Norfolk and Western. In that memorandum, Southern's parent repeated its policy that "all physical examinations required by the company include a drug screen urinalysis." A literal reading of the word "all" necessitates rejection of the Unions' claim that they had no notice until January 31, 1986, of the policy of conducting urinalysis testing as part of return-from-furlough medical examinations.

According to the record, Southern did communicate with the Unions on January 31, 1986, concerning physical examinations upon an employee's return from furlough. However, that communication did not concern the addition of drug screen urinalyses to return-from-furlough physical examinations. It concerned Southern's change in its policy governing the length of furlough that would trigger a return-to-work physical examination.

The Unions urge that such a change would alter the frequency with which an employee was subject to urinalysis screening, but that contention cannot alter the fact that the Unions were already on notice of the mandatory testing in return-from-furlough examinations, as well as periodic physicals. Because this action does not raise a claim that Southern tests too frequently, but rather that it should not have begun testing at all without negotiations, the January 31, 1986 memorandum is irrelevant. Thus, the statute of limitations properly began running on February 12, 1985.

Because the Unions filed this lawsuit more than six months after their causes of action accrued, the action was time barred from the beginning. Southern raised the statute of limitations as an affirmative defense in the district court, and it argued before this court that the Unions' claims were barred by the statute of limitations. Accordingly, we affirm the judgment of the district court on an alternative ground which finds ample support in the record. Our disposition therefore precludes our reaching the merits, about which we express no opinion.

AFFIRMED.